# IN THE SUPREME COURT OF TEXAS

════════════

No. 16-0075

════════════

HELIX ENERGY SOLUTIONS GROUP, INC., HELIX WELL OPS, INC.,
AND HELIX OFFSHORE INTERNATIONAL, INC., PETITIONERS,

v.

KELVIN GOLD, RESPONDENT

════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

════════════════════════════════════════════════════════

JUSTICE JOHNSON, joined by JUSTICE GREEN, JUSTICE LEHRMANN, and JUSTICE BOYD, dissenting.

When reviewing a grant of summary judgment, we consider the evidence in the light most favorable to the nonmovant—in this case, Kelvin Gold—and indulge every reasonable inference and resolve any doubt against the movant—in this case, Helix Well Ops, Inc., Helix Energy Solutions Group, Inc., and Helix Offshore International, Inc. (collectively, Helix). *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634, 645 (Tex. 2013). While the material summary judgment evidence in the record is for the most part undisputed, it is not conclusive. And "[u]ndisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Evidence qualifies as conclusive only if it rises to the level that reasonable people

could not differ in the conclusions they would draw from it. *Id.* Whether evidence reaches that level necessarily depends on the facts and evidence of each case. *Id.* Here, that means the "vessel in navigation" determination for purposes of the Jones Act may only be removed from the jury's consideration if the evidence conclusively establishes that for some relevant time period surrounding the time of a worker's injury, the watercraft on which the worker was injured was not practically capable of transportation. *See Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 496 (2005). Of course, what comprises a relevant time period must in itself be considered in light of the specific circumstances and facts of each case. *See id.*; *Chandris, Inc. v. Latsis*, 515 U.S. 347, 372–73 (1995).

Because Helix failed to meet its burden under the summary judgment standard to prove that the HELIX 534 (the 534) was out of navigation for time periods relevant to dates on which Gold claims to have been injured, I would affirm the judgment of the court of appeals.

## I. Summary Judgment Evidence

The Court reaches its decision based on both summary judgment evidence and, necessarily, inferences from that evidence. The evidence includes deposition testimony from Kelvin Gold and Jason Shropshire, the Director of Contracts and Risk for Helix Energy Solutions Group, Inc.; an affidavit from Shropshire; pictures of the 534 while it was being repaired and converted; pictures of the ship before and after its repair and conversion; various Helix documents referencing Gold; and a printout from Helix's website discussing the 534. For the most part, I agree with the Court's view of what the summary judgment evidence establishes. To review, those matters are set out below.

The 534 was an older drill ship when Helix purchased it for $85 million. It had engine problems and needed major repairs that included removing and replacing old equipment. The ship

2

was towed to the Jurong shipyard in August 2012, where Helix placed it under the shipyard's control for repairs and conversion to a well intervention ship. The work a well intervention ship does and is equipped to do is different from that of a drill ship. The repair and conversion work in the shipyard was supervised by both the shipyard and a Helix representative who was responsible for capital expenditures.

Helix hired crew personnel, including Gold, while the repairs and conversion were ongoing so they could begin familiarizing themselves with the 534. Helix wanted the ship to be ready to work once the repairs and conversion were completed.

Gold was employed by Helix from November 2012 through November 2013. The only ship he worked on while employed by Helix was the 534. He began working on the ship in early December 2012, and worked 28-day "hitches" in December and February, as well as part of a hitch in April. Gold testified that when he worked on the 534, it did not have operable engines, lacked ability for self-propulsion, and was always moored dockside in the shipyard. His duties while working on the ship included familiarizing himself with the ship and equipment aboard the ship, together with minor maintenance and repair work. The 534 did not serve as either a drill or well intervention ship during the time Gold worked on it in December, February, and early April.

Helix underestimated the extent of necessary repairs and the difficulty of the conversion, as well as the time necessary to accomplish them. Difficulties in obtaining parts, such as engine equipment, also caused the repairs and conversion to take longer and cost more than originally anticipated. The ship was dry-towed to the Galveston shipyard in September 2013. Repair and conversion work "topside" and on the engines continued in Galveston until April 2014, when the

3

work was completed.  When the 534 left the Galveston shipyard, it began working as a well intervention ship.  The total repair and conversion cost amounted to approximately $115 million.

## II.  "In Navigation" is a Matter of Degree

In *Chandris*, the Supreme Court recognized that at some point when a ship is temporarily withdrawn from sailing so it can be repaired, the repairs become sufficiently significant such that the vessel is no longer in navigation.  515 U.S. at 373–74.  Likewise, major renovations can take a ship out of navigation even though it will again be used in transportation after the renovations are accomplished.  *Id.* at 374.  The bottom line according to the Court in *Chandris*: whether a ship undergoing repairs qualifies as a vessel in navigation is a matter of degree.  *Id.*  The point where the "degree" is reached—where repairs and modifications move a vessel from one in navigation to one not in navigation—"is normally for the jury and not the court to decide."  *Id.* at 373.

The facts proved by summary judgment evidence and set out above establish that the 534 was not practically capable of transportation from the time Gold began working on it in December 2012, when he reported his first injury, until early April 2013, when he reported that he aggravated his injury, that is, he was injured a second time, and stopped working on the 534.  However, just how long it was not practically capable of transportation before he began work and how long it remained that way after the date he reported his second injury was not conclusively established, despite the Court's position otherwise.

In response to Helix's motion for summary judgment, Gold, in part, referenced Shropshire's deposition testimony.  Shropshire testified that the 534 was "not a vessel in navigation or commerce. It was under repair, under conversion."  The first statement is the type of subjective, conclusory

4

opinion that the Supreme Court cautioned courts about considering in *Lozman v. City of Riviera Beach*, 133 S. Ct. 735, 744 (2013). The second statement contains factual information about the 534's condition, but it does not indicate anything about a specific time frame. Shropshire stated in his affidavit that the 534 lacked any ability for self-propulsion and needed the assistance of tugs or tows to be moved. *See id.* at 741 (lack of self-propulsion is not dispositive but may be a relevant physical characteristic). But he did not specify at what point the components were removed or whether they were lacking to begin with, whether the 534 was without them for the entire time it was in the Jurong shipyard and while Gold was working on the ship, whether they remained lacking after Gold reported his second injury and stopped working on the ship in April 2013, and if so, for how long. He testified that he did not know if the 534 was physically incapable of sailing for the entire time between December 2012 and April 2013. In response to specific questions about when the engines were taken off and when they were put back on, the best Shropshire could do was state, "I believe this was done very early on." He did not know when the in-line propulsion equipment was removed or replaced.

The Court bases its conclusion that the 534 was not in navigation either at the time Gold reported he was injured in December 2012 (the first injury) or in April 2013 (the second injury) on evidence that (1) the propulsive equipment and other components required repair or replacement; (2) the ship was purchased with the express goal of conversion; (3) the 534's function changed; (4) new equipment was added and obsolete equipment was removed; (5) the conversion work took place at the hands of a contractor; (6) the duration of the project was twenty months and cost $115 million; (7) the 534 was out of service for the entire duration of the overhaul; and (8) the 534's

5

conversion rendered the ship practically incapable of transportation for months at a time. *Ante* at

\_\_\_.

Items (1) through (5) are factual matters not in dispute. But none of them address the determinative question: was the 534 practically incapable of navigation for some relevant period of time as of each of the two different dates on which Gold claimed to have been injured.

Item (6) references the extensive time and cost to accomplish the conversion, but those facts cover the entire time of repair and conversion and are not limited to a relevant time period surrounding Gold's injury in December and its exacerbation in April. Item (7) is not conclusively established by the evidence, but even if it were, being "out of service" does not equate to being out of navigation. There are many reasons a vessel could be out of service, such as the owner let the crew take extended time off due to a lack of business. The Court would be correct as to item (8) if it said "practically out of service" for months at a time; but being out of service does not equate to being out of navigation, as noted in regard to item (7), and as the Court recognizes in its opinion. *Ante* at \_\_\_ (citing *Chandris*, 515 U.S. at 373–74).

As to all of these matters referenced by the Court, it must be remembered that although in a trial a factfinder might infer from them that the 534 was not in navigation for the time periods relevant to Gold's injury dates, this was a summary judgment proceeding. That being so, the inferences flow the other way—against Helix's position that the ship was out of navigation.

Reviewing the summary judgment record in a chronological manner, the first stop is the Court's statement that the 534 "was laid up, taken out of the water, at the time Helix purchased her." *Ante* at \_\_\_. All the evidence as to the ship's status when it was purchased came from Shropshire,

6

who offered the conclusion that it was not in navigation and he "believe[d] it was laid up." But he provided no explanation for what he meant by "laid up," and there is no other summary judgment evidence about what the term means, whether it was out of water, or what the 534's status was before Helix purchased it. Nor did Shropshire testify about facts underlying his "belief," how long he believed the ship had been "laid up," or even whether he believed it had been laid up for lack of work, or because its crew had been laid off, or for repairs or refurbishing of some nature. The 534 could have been laid up for any number of reasons, only some of which would have made it physically and practically incapable of transportation. Properly applied in this summary judgment proceeding, the inferences are that before the December date on which Gold claims to have been injured the 534 was laid up or inactive for reasons other than its being physically incapable of sailing and transporting people or materials.

As to the time after Gold no longer worked on the 534 because of his second claimed injury, there is no factual evidence whatsoever as to the ship's condition. Gold's testimony is as close as the factual summary judgment evidence gets to that time period. But he unquestionably had no knowledge of the 534's physical condition after he stopped working, left the ship, and returned to his home in the United States. And Shropshire did not address the condition of the 534 after the date on which Gold reported that his second injury occurred, except to say the ship was piggybacked to Galveston several months later, in September 2013, where it stayed until it began voyaging in the spring of 2014. The fact that the 534 was "piggybacked" from Singapore to Galveston in September might support an inference by a factfinder in a trial that the 534 was not practically capable of sailing when that piggyback transfer occurred. But the same inferences cannot be drawn in support of the

7

summary judgment motion.  Its being piggybacked is not evidence that it was physically incapable of sailing and transporting on its own.  Again, properly applied in the summary judgment context, inferences must be drawn against the conclusion that the 534 was out of navigation after Gold last worked; that is, the inference that must be applied is that it became physically capable of navigation shortly after Gold last worked on it in April, regardless of whether it actually sailed or was in navigation. Similarly, as to the time the repairs and conversion were being completed in the Galveston shipyard, Shropshire's testimony that he "believed" some work on the topside had to be finished and that there were some generator issues might support an inference by a factfinder in a trial that the 534 was physically incapable of sailing during that time.  But that inference cannot be drawn in support of a summary judgment.

To reiterate, inferences that might be made in favor of the position of a movant for summary judgment do not substitute for evidence, nor will they support a summary judgment.  To the contrary, all inferences must be drawn *against* the position argued for by a movant for summary judgment. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2015).

All that having been said, I agree with Helix that the summary judgment evidence establishes the 534 was not practically capable of engaging in transportation from the time Gold began working on the ship in December 2012 until the time he last worked aboard it in April 2013.  Gold's testimony was clear about that.  However, determination of in navigation vessel status is not made by considering only what a watercraft was doing or what was happening on it at a particular day or time by means of a "snapshot" look at the circumstances.  *Stewart*, 543 U.S. at 483, 495 (citing

8

*Chandris*, 515 U.S. at 373–74). The Court recognizes this and says that its view of the evidence does not present a "snapshot" problem. *Ante* at ___. I disagree.

Neither seaman status nor vessel in navigation status can be evaluated by "inspecting only the situation as it exists at the instant of injury" because "a more enduring relationship is contemplated in the jurisprudence." *Chandris*, 515 U.S. at 363. And in explaining what the "in navigation" requirement means in relation to the determination of whether a ship is a vessel, the Supreme Court clarified that "structures may lose their character as vessels if they have been withdrawn from the water for *extended* periods of time." *Stewart*, 543 U.S. at 496 (emphasis added). The Supreme Court has not articulated specific time standards for measuring whether a watercraft is in or out of navigation; as noted previously, its guidance is that "in navigation" for Jones Act purposes is normally a jury question. *Chandris*, 515 U.S. at 373.

Given that guidance, the question in this case boils down to evidence about how long *before* the date of Gold's December injury the 534 was not practically capable of navigation, if it was not; and how long *after* the date of his April injury the 534 was not practically capable of navigation, if it was not. The evidence of neither is conclusive. To be more pointed, it is nonexistent, even without inferences being drawn against Helix as required in summary judgment proceedings. Shropshire's testimony is closest to being some evidence, but the best he could testify to regarding when the engines were removed from the 534 was "early on." That could have meant in December, just before Gold started work. Shropshire did not elaborate, either in his deposition or in his affidavit in support of Helix's motion for summary judgment. Neither did he testify about the condition of the 534 during the time immediately after the date on which Gold claims to have been

9

injured in April 2013. So, if a reasonable period of time extends beyond more than a few days before Gold's first claimed injury in December or a few days after his second claimed injury in April, then the evidence simply was not conclusive that the 534 was out of navigation within the meaning of the Jones Act as to both the December injury and the April injury.

So, what is a "relevant" time frame for purposes of the question before us? Even though the Supreme Court has not articulated a specific time frame to be applied in determining if a ship is out of navigation, it has noted that six months of repair work "seems to be a relatively short period of time for important repairs on oceangoing vessels." *Chandris*, 515 U.S. at 374. In *Chandris*, the Court compared the entire length of time a ship underwent repairs in several different cases, citing *McKinley v. All Alaskan Seafoods, Inc.*, 980 F.2d 567, 571 (9th Cir. 1992)—where a repair period of seventeen months and involving major structural changes took the vessel out of navigation—and *Wixom v. Boland Marine & Manufacturing Co.*, 614 F.2d 956 (5th Cir. 1980)—where the repair project lasted three years. 515 U.S. at 374–75.

In *Chandris*, as with the case before us, there was "relatively little evidence" bearing on the ship's status during the repairs. *Id*. at 374. The Court concluded "it is possible that Chandris could be entitled to partial summary judgment or a directed verdict concerning whether the [ship] remained in navigation while in drydock; the record, however, contain[ed] no stipulations or findings by the District Court to justify its conclusion that the modifications to the [ship] were sufficiently extensive to remove the vessel from navigation as a matter of law." *Id.* at 375. The point in *Chandris* is not that six months of repairs is always either a sufficient or an insufficient time period to prove that a ship is not a vessel in navigation as a matter of law. Rather, *Chandris* advances the principle that

10

determination of a vessel's status is not to be removed from the jury where there is "relatively little evidence" on the vessel's status during the repairs, despite there being evidence that the repairs are "actually quite significant." *Id.* at 374–75. The same can be said here: while Helix might have been able to prove the status of the 534 before Gold's claimed December injury date and after his claimed April injury date, it did not do so. Which is not to say Helix could not do so if the case were to be remanded to the trial court.

The Court relies on *West v. United States*, which concerned a worker injured on the *S.S. Mary Austin*, a ship that had been "in total deactivation for several years" and whose pipes, boilers, and tanks had been completely drained. 361 U.S. 118, 119 (1959). The ship was ordered reactivated, and a contractor was hired to prepare the ship for sea duty. *Id.* The contractor was charged with "cleaning and repairing all water lines, replacement of all defective or missing plugs and other parts, and the testing of all lines before closing and placing them in active operating condition." *Id.* The contractor had complete responsibility for and control over the repairs. *Id.* The United States placed a crew of six men on board to serve solely as inspectors. *Id.* at 119–20. The *Mary Austin* was towed to the contractor's repair docks in Philadelphia and turned over for performance of the repair contract. *Id.* at 120. One of the contractor's shore-based employees was injured while working aboard the ship and sued. *Id.*

The Supreme Court affirmed the trial court's denial of recovery, holding that the *Mary Austin* was not in maritime service because it was undergoing major repairs and complete renovation. *Id.* at 122. The Court relied on the following facts: (1) "for several years, the *Mary Austin* was withdrawn from any operation whatever while in storage with the 'moth-ball fleet'"; (2) the water

11

had been drained and an antirust preservative was injected into the ship's water system; (3) the ship was towed to Philadelphia for the specific purpose of delivery to the contractor to render her seaworthy; (4) the representation of the repair contract specifications was that the ship was not seaworthy for a voyage and "the major repairs called for therein would be necessary before one would be undertaken"; (5) the sole purpose of the ship's being at the contractor's repair dock was to make it seaworthy; (6) the totality of the repairs "included compliance with the hundreds of specifications in the contract calling for the repairing, reconditioning, and replacement, where necessary, of equipment so as to make fit all the machinery, equipment, gear, and every part of the vessel." *Id.* at 120–21. Additionally, the contractor was in control of the repairs rather than the shipowner. *Id.* at 122. The repairs were not simply minor ones, nor even significant ones. They were "a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy." *Id.*

Here, there is no evidence of how long the 534 had been "laid up"—whatever Shropshire meant by that characterization—when Helix purchased it. There certainly was not evidence the 534 had been out of navigation for several years, or even months. Nor was there evidence, for example, that its water system had been drained before Helix purchased it.

The same is true for *McKinley v. All Alaskan Seafoods, Inc.*, which the Court references. 980 F.2d at 567. In that case, the movant for summary judgment presented evidence detailing the work done on the ship, which the court summarized, then noted that its summary did not "fairly reflect the magnitude of the reconstruction." *Id.* at 570–71. Additionally, *McKinley* was decided on "whether

12

the vessel has been placed in navigation for its intended purpose." *Id.* at 571 (citing *Garret v. Dean Shank Drilling Co.*, 799 F.2d 1007, 1009 (5th Cir. 1986)). But the Supreme Court has since moved away from the "intended purpose" test. *See Lozman*, 133 S. Ct. at 744–45 (holding that the determination of vessel status should be based on the views of a reasonable observer and not the subjective intent of the owner); *see also Stewart*, 543 U.S. at 496 (the proper test is simply whether a watercraft's capability to be used as a means of transportation is a practical possibility as opposed to a theoretical one).

In contrast to *West* and *McKinley*, the evidence Helix presented lacks details as to the status of the 534, the pattern of the repairs, and the extensive nature of the work contracted to be done. *See West*, 361 U.S. at 122; *see also McKinley*, 980 F.2d at 570–71.

Finally, in *Chandris*, the Court favorably cited *Butler v. Whiteman*, in which the Court reversed a judgment of the court of appeals affirming a directed verdict for the owner of a tugboat in a case brought under the Jones Act by the widow and children of an employee that drowned. *Chandris*, 515 U.S. at 373–74 (citing *Butler v. Whiteman*, 356 U.S. 271, 271 (1958)). In a per curiam opinion without discussion of the facts of the case, the Court held, in part, that the trial evidence presented a fact question regarding whether the tug was in navigation. *Butler*, 356 U.S. at 271. Justice Harlan, in dissent, addressed the condition of the tug in brief fashion. He concluded that for some months before the decedent's death the tug had been withdrawn from navigation because it was inoperable. *Id.* at 272 (Harlan, J., dissenting). As to the underlying facts, he said only that when the decedent died the boat was undergoing rehabilitation in preparation for a Coast Guard inspection. *Id.* The court of appeals elaborated on facts concerning the boat's condition little more

13

than did Justice Harlan. *Harris v. Whiteman*, 243 F.2d 563, 564 (5th Cir. 1957). Its opinion stated only that the tug was "a 'dead ship' on which no steam had been raised during the year 1953 and which had no Coast Guard certificate permitting it to operate" at the time the decedent drowned in October 1953. *Id.*

The evidence presented in this case is similar to that in *Butler*, meaning that the evidence only establishes that the 534 was inoperable for some months. It fails to conclusively establish that the 534 was practically incapable of transportation for the days and weeks before the December date on which Gold claims to have been injured, or the days and weeks after the date on which he claims to have been injured in April.

The Court states that focusing on a time element elevates the duration of the repairs and conversion to the "status of a precondition." *Ante* at ___. I disagree. There certainly is not a rule requiring a particular duration of repair or conversion work before a court may grant summary judgment on the vessel in navigation issue. But the focus *must* be on whether a ship's capability to be used as a means of transportation "is a practical possibility or merely a theoretical one," over an "extended period[] of time." *Stewart*, 543 U.S. at 496. The Court correctly points out that the Supreme Court left open the possibility for summary judgment for the shipowner in *Chandris* when a six-month renovation was involved. *Ante* at ___. But in *Chandris* the Court also explained that repairs or work on a ship must be sufficiently significant in both magnitude and duration that a reasonable person could *only* conclude that it was out of navigation at the time of injury. *Chandris*, 515 U.S. at 373–74. Here, the evidence regarding the ship's status or practical capability to transport persons or things before December and after early April simply is not such as to support summary

14

judgment when properly considered under summary judgment standards and relevant Supreme Court authority. It may be that Helix could yet provide such evidence. But under the record before us, it has not.

### III. Conclusion

I agree with the court of appeals that the trial court erred in granting summary judgment for Helix. I would affirm its judgment.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 16, 2017

15