**Opinion issued July 2, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00403-CV

———————————

### JULIA MARSHALL AND DENNIS MARSHALL, Appellants

### V.

### ESA MANAGEMENT, LLC, Appellee

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-40034**

---

## MEMORANDUM OPINION

Appellants Julia Marshall and Dennis Marshall sued appellee ESA Management, LLC (ESA) for premises defect after Julia slipped and fell at a hotel property managed by ESA. The trial court granted summary judgment in favor of ESA, and the Marshalls now appeal, arguing that the trial court erred in granting

summary judgment because: (1) ESA's motion "failed to address the unreasonably dangerous condition that the Marshalls actually alleged"; and (2) genuine issues of material fact exist with regard to each element of the Marshalls' claim. Because we conclude that ESA's motion for summary judgment properly challenged the Marshalls' premises liability claim and that the Marshalls failed to raise a genuine issue of material fact regarding whether ESA had actual or constructive knowledge of the alleged defect, we affirm.

**Background**

On January 1, 2015, the Marshalls, who are married, arrived in Houston to attend a boat show, and they checked into Room 324 at the Extended Stay America hotel located near NRG Stadium in Houston, a property that is managed by ESA. The Marshalls alleged that, on January 2, Dennis left their room sometime before noon to attend the boat show while Julia remained behind at the hotel to rest. Julia woke from a nap in the middle of the day, and without turning on any lights or opening the curtains, she attempted to walk to the bathroom. To do so, she had to walk past the full-sized refrigerator in the room. The Marshalls allege that the refrigerator in their room was defective and, "since [Julia] had last walked by this area, [it had] leaked extensively, leaving a puddle of water on the floor." They assert that Julia slipped in the puddle of water, "striking her head violently, resulting in severe and life changing injuries."

The Marshalls sued ESA for premises liability, asserting that the leaking refrigerator posed an unreasonable risk of harm about which ESA knew or should have known and that ESA failed to make the dangerous condition reasonably safe or to adequately warn the Marshalls of the danger. They asserted that ESA's breach of its duty proximately caused their harm and sought damages for, among other things, Julia's medical expenses, physical and mental pain, and Dennis's loss of consortium.

ESA moved for summary judgment, arguing that the dangerous condition that caused Julia's injuries did not exist until the Marshalls "had exclusive possession of the room." ESA asserted that "[t]he undisputed evidence is that [ESA] did not possess knowledge, actual or constructive, of an unreasonably dangerous condition in the Marshalls' hotel room and, therefore, [ESA] did not breach any duty owed to [the Marshalls]." Specifically, ESA asserted that (1) it did not have actual knowledge of the alleged danger; (2) it did not have constructive knowledge of the alleged danger; (3) absent notice, there was no duty to remedy or warn of the allegedly dangerous condition; (4) as a matter of law, ESA's acts or omissions were not a proximate cause of Julia's injuries; and (5) Dennis's derivative claims of loss of consortium and loss of household services fail because Julia's claims fail.

The Marshalls responded to the motion for summary judgment, arguing that ESA had a history of failing to maintain the "old, low-grade, leak-prone refrigerator units" that were placed "on top of hard, linoleum floors." They argued that the refrigerator in their room began to leak during their stay and that Julia was injured when she slipped in the leaked water. The Marshalls asserted that ESA had both actual and constructive knowledge of the dangerous condition and failed to exercise reasonable care to remedy that condition. They further argued that, even if ESA was not aware of the specific leak causing Julia's fall, there was still evidence that ESA was aware, or should have been aware, of a high risk that a dangerous condition would occur because of the history of leaking refrigerators. They argued, "[t]here is considerable evidence that the refrigerators at ESA were prone to malfunctions and susceptible to leakage on the day Julia Marshall fell" and that ESA had actual and constructive knowledge that "its refrigerator setup posed an unreasonable risk of harm to its guests."

ESA then replied to the Marshalls' response, raising objections to the Marshalls' summary judgment evidence and, among other things, addressing the Marshalls' complaints regarding the refrigerator setup itself.

The summary judgment evidence included, among other items, the deposition testimony of the Marshalls, Sergio Jimenez (a maintenance worker for

ESA), Sheila Shepard (a housekeeper for ESA), Thomas Gerald Lauersdorf, III (the manager on duty at the time), and maintenance records.

Dennis testified that he and his wife checked in to their room on January 1, 2015, and put away drinks and lunch meat that they had brought to their room. They did not notice anything wrong with the refrigerator at that time. He left for the boat show on January 2, which started sometime between 11:00 am and noon. Julia stayed behind in the room to rest. When Dennis left, he didn't notice anything wrong with the refrigerator, nor did he notice any water on the floor. He spoke with Julia by phone later that afternoon; she did not mention falling and told him only that she had been sleeping. He returned to the room around 9:00 p.m., after the boat show was over for the day, and that was when he realized Julia was hurt. She told him at that time that she had slipped in water by the refrigerator and that the hotel had sent someone who "had a bunch of towels with them" and "put [the towels] on the water on the floor." Dennis acknowledged that he was not there when the fall occurred, so he only knew what Julia had told him about the circumstances surrounding her fall.

Dennis requested that the hotel create an incident report, which he received on January 7, 2015, five days after the fall. Dennis stated that he and Julia kept a towel by the refrigerator for the remainder of their stay and that he would "[c]hange it out every day. It would be damp, wet." He testified that "[i]t looked

5

like the bottom shelf in the refrigerator would freeze. And then as you started using it, it would melt. For some reason the refrigerator was malfunctioning and the inside was freezing and the water was running from the door. Like it would melt and run out the front." He testified that he reported the malfunctioning refrigerator to the front desk, but, to his knowledge, no one ever came to check it. He testified that other members of their party who were staying in another room at the same hotel also "wound up having a towel in front of their[] [refrigerator] as well." The Marshalls checked out as planned on January 12, 2015.

Julia testified that she does not recall the details of her fall. She testified, however, that she made some notes following her fall as a "coping mechanism" because she was confused and experiencing memory problems after her fall. Those notes indicated that she fell on the way to the bathroom when she slipped on the wet floor. The notes also indicated that after she attempted to call 9-1-1, she instead reached the front desk. She wrote that a man came in and "[h]e had towels. Cleaned up floor and said [the] refrigerator leaked and that we'd need to keep towels by it so water would not spread." She also testified that she did not feel like going to the hospital and did not receive medical treatment at that time.

Julia also submitted her sworn declaration as summary judgment evidence. In her declaration, she stated that she called for help after her fall:

I told the person at the hotel desk that I had fallen and was scared. I did not tell the person how I had fallen and did not mention a leaking refrigerator.

   After I got off the phone, a man who worked at the hotel came into my room. The man from the hotel brought towels with him. He said the refrigerator in my room leaked and that he would need to keep towels by it so that the water would not spread. He then put towels on the floor by the refrigerator.

ESA produced some redacted maintenance records. The affidavit of the regional manager that accompanied the records indicated that the electronic maintenance logs were kept in the regular course of business and covered the period of time between January 2, 2010, and January 2, 2015. The records indicated that there were no previous complaints about the refrigerator in Room 324 in the five years before Julia's fall. The log further showed that Room 324 received "preventative maintenance" in December 2014 and was last serviced by ESA staff two days before the Marshalls checked in, and there were no concerns regarding the refrigerator noted at that time. In the years preceding Julia's fall, the hotel logged approximately twenty-five complaints about non-functioning refrigerators for all 170 of the hotel's rooms, but only two of those complaints indicated that the room's refrigerator was leaking in some way. There was no evidence of the nature or extent of these two previously reported leaks in the maintenance records. There was also no evidence of any prior guests being injured as a result of a refrigerator leak or malfunction.

Lauersdorf, the assistant manager at the time, testified that he was the one who received Julia's call after she fell. He walked to her room immediately after receiving the call. Julia told him she had slipped in front of the refrigerator, and he noticed a puddle of water in front of it. He could not recall whether the water was coming from the refrigerator or not, observing that the sink was also nearby. He said that he was unable to tell whether it came from the sink or the refrigerator, stating, "From what I remember, it was just a singular puddle, so it's—it's hard to find the source on that." He testified that he had the water cleaned up and "sent engineering out." Lauersdorf further testified that, at the time he checked on Julia, she told him she was fine, did not need medical care, and did not want to fill out an incident report. Later, however, at her husband's request, Lauersdorf filled out the incident report, but she "still refused medical attention after that point."

Lauersdorf also testified that the hotel kept additional appliances on hand to replace the ones in the room as necessary. Regarding refrigerators, he stated that how often they were replaced depended on "how many were going out" and that they were replaced "as needed." He stated, "Maybe, as I can recall, one a week, two a week, at most," and he later clarified, "It could be a week where there weren't any." Regarding the types of problems that the property would have with refrigerators, he stated

> I mean, there's all—I mean, there's the fridge just isn't cooling. There is—Just like with any other fridge, there can be something where

8

there—it causes a leak. Freezer, clogged water line; wear and tear; guest could damage it. It could be a fair amount of different things, I guess, that could happen.

Lauersdorf testified that he did not know how old the refrigerators were at the time of Julia's fall and that he did not know how long refrigerators were supposed to last. He further testified that if a refrigerator leaked, ESA "would do everything [it] could to fix it." He further stated, "every refrigerator's on an individual case. . . . I'm not sure if that means that just because the refrigerator's at a certain age we should just, necessarily, start replacing them or anything like that." Lauersdorf testified that he was unsure whether the number of refrigerator problems was a "high number," and he was unwilling to testify that he believed ESA's refrigerators needed repairs on "a regular basis." He stated that the hotel had to replace a lot of things ranging from mattresses to lamps.

Regarding the specific refrigerator in Room 324, Lauersdorf could not recall that there were any "ongoing problems" with the refrigerator before Julia's fall. He testified that he was not aware of what happened to the refrigerator after Julia's fall, but he could not imagine that it had been left in disrepair. He was not sure if it had been replaced.

Sheila Shepard, a housekeeper at the property, testified that the extended stay hotel did not typically provide daily housekeeping. She testified that rooms would be cleaned in between customers and after a guest had been in the room for

9

seven or eight days. The rooms could be cleaned more frequently if the customer requested and paid for additional housekeeping service. She and the other housekeepers would be given a list of rooms to clean at the start of a shift, and they would only clean the rooms they were assigned.

Regarding the refrigerators, Sheila testified that she saw refrigerators being replaced during her time at ESA, but specifically for the time frame of late 2014 through 2015, she did not remember any of the refrigerators in the rooms that she cleaned needing to be replaced. Sheila had no personal knowledge regarding Julia's fall or the condition of the room or the refrigerator at the time the Marshalls checked in. She testified generally that she had never heard any complaints relating to leaking refrigerators. She further testified:

[Q]: Have you notice leaking refrigerators.

[A]: Not recently.

[Q]: Not recently. But sometime ago, did you?

[A]: I've seen.

[Q]: Right. Because there was a time that the refrigerators were leaking a fair amount. . . . Is that fair?

[A]: That's fair.

. . . .

[Q]: And it didn't matter which room you were in, the—the refrigerators were kind of on their last legs and one of the problems that came up is: they were leaking.

10

[A]: Yes.

[Q]: And you would go to a room and see water pooling in front of these refrigerators and you put it on your [cleaning] form.

[A]: Yes.

. . . .

[Q]: And then you go to the next room and you'd find the exact same thing and you'd put it on your form. Right?

[A]: Yes.

[Q]: And any given day, if you had twenty-five rooms, could you have as many as half of those that you had leaking refrigerators?

[A]: Less.

Sheila testified that maybe "five or six" refrigerators in the rooms that she cleaned would have been leaking. She indicated that she had no way of knowing if the maintenance person would actually repair the refrigerators after she marked them on her cleaning sheet, and she also agreed with the Marshalls' counsel's statement that she would sometimes return to a room to find that it still had the same problem.

Sheila later clarified her testimony regarding the refrigerators, indicating that the total number of refrigerators she had discovered to be leaking was "[o]ne to five" for the entire time she had been working at ESA. She testified:

[Q]: When I was asking you questions about the refrigerators that you had seen and then you'd come back and then they'd be leaking at the same time, that's–But now your testimony is that,

11

in the whole time that you've been there, you've only seen one to five, that removed the—

[A]: One to five. One to five.

[Q]: Okay. But, apparently, if your other testimony to me was, also, accurate, at least one of those, you came back, and you found the same refrigerator leaking more than once.

[A]: Not as in leaking, as of—of, on the floor. When I mentioned, as in leaking of—of what I see of water of the refrigerator, we have . . . [Some guests] will unplug the refrigerator. That's how it go. And I look at my refrigerators, and I would—thinking if it's not working. I would check, and I would know, when those guests get there around that time, they unplug the refrigerator. And I'll look in; the water's in the refrigerator. But it's from where it's defrosted from un—being unplugged.

[Q]: Okay.

[A]: But not on the floor.

Sheila testified that before 2015, the maintenance man for the property, Ismael, understood English but did not speak it very well. She believed that he understood what she said to him because "[h]e would go and do his job. He did a very good job." She also testified that the maintenance slips were "in English and Spanish." She had no knowledge regarding his method of keeping maintenance records.

Sergio Jimenez, another maintenance worker, testified that he began working at the hotel on December 8, 2014, less than a month before Julia's fall. He had transferred to Houston from an ESA property in California. Jimenez testified that he provided maintenance for the property and, in addition to regular duties like

12

removing garbage and performing preventative maintenance, he would receive work orders for things that needed to be done around the property, such as changing out light bulbs or repairing leaky sinks. He testified that he would keep the written work orders just until the repairs were completed. After January 2015, he started to use a work register that he referred to as the "Green Shield" for recording all maintenance and work done based on the work orders, but that procedure was not in place in the time leading up to Julia's injury. Rather, at the time of Julia's fall, Jimenez was working with Ismael. Ismael had worked at that property for a while before Jimenez arrived, but he left in early 2015. Ismael could not speak English and did not keep records of his work as far as Jimenez was aware.

Regarding refrigerators, Jimenez testified that he generally did not work on them because he was not licensed for most of the repairs they would need, but he could replace the fans or light bulbs if those went out. He testified that there were "a lot of ways [a refrigerator] can defrost" unexpectedly, including if the fan goes out or "[i]f you leave the door open." During his deposition, Jimenez testified as follows:

> [Q]: It's the job of [ESA] to be able to provide rooms for their guests that are free of unreasonably dangerous conditions like puddles of water on the floor, right?
>
> [A]: Yeah.

13

[Q]: And sometimes a puddle of water accumulates over time, right? You've seen that?

[A]: Yes. It's leaking, something like, yeah.

[Q]: Sure. You've seen leaking refrigerators before?

[A]: Yes

. . . .

[Q]: If you have a whole bunch of refrigerators that are on their last legs and are going out so much that you have to be replacing them, pulling them out and putting a new one in, [ESA] knows these dangerous condition are about to occur, right?

[A]: Yes.

. . . .

[Q]: The refrigerators, are they all the same brand?

[A]: Now, yes. . . . . We replace[d] all the refrigerators last year [in 2016].

. . . .

[Q]: Okay. And the reason that you did that was because the old refrigerators were on their last legs.

[A]: Because they was rusting. That's when I talk to them. My case, it was like rusty, all stuff like that. It was so heavy, like, to replace it or to move those refrigerators was little heavy, so that was the reason we replace those refrigerators.

Jimenez did not remember what brand the old refrigerator in Room 324 was, although he thought it might have been a Whirlpool.

14

Jimenez testified that he did not know anything about Julia, her fall, or the incident report that was created following her fall. Jimenez did not remember any particular problems with her room, and he stated that it would be hard for him to remember any details about a particular room from the time of Julia's fall, which had occurred close to three years before his deposition was taken. Thus, Jimenez did not have any personal knowledge regarding the refrigerator in the room where Julia was injured. But when asked generally, "If you were told that there was a refrigerator that was leaking for some reason, who knows what, what would you be doing with it?" he answered, "We replace [it] or we remove [it] from the room." He testified that if the refrigerator could not be fixed, it would be replaced and that the room would be "out of service"—meaning no guests would be placed in there—until there was a functioning refrigerator in the room. The following testimony was elicited:

> [Q]:   In your experience, what are the sorts of things to look for in terms of problems with leaking refrigerators?

> [A]:   Most time it is the time defroster is the problem. When it's leaking that kind of water, it is time defrost. . . . [A] [c]ouple those different brand they have in the back, in the bottom, the back. That old style was in the back. The time defrost was all the way the bottom, the back. The new one it have I believe inside now by the panel where is the fan.

> . . . .

> [Q]:   If the time defroster goes haywire, then you can expect the refrigerator to leak?

15

[A]: Sometimes, yes.

. . . .

[Q]: And do you sometimes get warning that the time defroster is going to go out?

[A]: No. It's electric. . . . Never know when it can be running out. It's not something like you can prevent those like that.

[Q]: Okay. But the way it works is that it can—it can go out and everything leaks, but then the defrosting cycle is over and then it freezes up again, right?

[A]: Yes.

[Q]: So what that means is, is that it will leak periodically until you fix it, right?

[A]: Yes.

. . . .

[Q]: Okay. So someone like Julia Marshall and her husband can go into one of these rooms not knowing that the time defroster on the refrigerator has been haywire for a while, and then, low and behold, few hours later they got a big puddle of water in there right?

[A]: Yes.

Jimenez testified that if that had been going on, the housekeepers, at least in theory, would notice. Jimenez also testified that refrigerators could malfunction from the "time defrost or [it] can be something else also in the refrigerator, you never know." He said that a malfunctioning fan or thermostat could cause leaking in a refrigerator, and he stated, "Also, sometimes if they did disconnect the

16

refrigerator, also they can—because we have couple customers disconnect the refrigerator because they say, you know, the compressor make a little noise. They disconnect the refrigerator. That's why defrost also."

Ultimately, the trial court granted summary judgment in favor of ESA, and this appeal followed.

## Summary Judgment

On appeal, the Marshalls challenge the trial court's granting ESA's summary judgment motion and order that the Marshalls take nothing by their claims.

### A.    Standard of Review

We review summary judgments de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *City of Richardson*, 539 S.W.3d at 258–59. A defendant moving for summary judgment must conclusively negate at least one essential element of the plaintiff's cause of action. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997); *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 704 (Tex. App.—Houston [1st Dist.] 2014, no pet.). If the movant establishes its entitlement to summary judgment, the burden then shifts to the nonmovant to raise a genuine issue of material fact. *See Katy Venture, Ltd. v. Cremona Bistro Corp.*,

469 S.W.3d 160, 163 (Tex. 2015) (per curiam); *see also Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014) ("[I]f the movant does not satisfy its initial burden, the burden does not shift and the non-movant need not respond or present any evidence.").

A party may also, after adequate time for discovery, move for no-evidence summary judgment on the ground that no evidence exists of one or more essential elements of a claim on which the adverse party bears the burden of proof at trial. TEX. R. CIV. P. 166a(i). The burden then shifts to the nonmovant to produce evidence raising a genuine issue of material fact on the elements specified in the motion. *Id.*; *Mack Trucks, Inc v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The trial court must grant the motion unless the nonmovant produces summary judgment evidence raising a fact issue on the challenged elements. TEX. R. CIV. P. 166a(i).

We review the evidence presented in the motion and response in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017).

**B.     Analysis**

ESA moved for traditional and no-evidence summary judgment in part on the ground that it had no actual or constructive knowledge of the dangerous condition in the Marshalls' room, which is an essential element of the Marshalls' premises liability claim.

*1.     Premises liability law*

Generally, a premises owner has a duty to protect invitees from, or warn them of, conditions posing unreasonable risks of harm if the owner knew of the conditions or, in the exercise of reasonable care, should have known of them. *Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014) (per curiam) (citing *TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 764–65 (Tex. 2009)); *see also Motel 6 G.P., Inc. v. Lopez*, 929 S.W.2d 1, 3 (Tex. 1996) (treating motel guest as invitee for purposes of premises liability). Thus, to prevail on a premises liability claim, an injured invitee must establish: (1) the property owner had actual or constructive knowledge of the condition causing the injury; (2) the condition posed an unreasonable risk of harm; (3) the property owner failed to take reasonable care to reduce or eliminate the risk; and (4) the property owner's failure to use reasonable care to reduce or eliminate the risk was the proximate cause of injuries to the invitee. *Henkel*, 441 S.W.3d at 251–52 (citing *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000)); *see also Keetch v. Kroger Co.*, 845 S.W.2d 262, 264

19

(Tex. 1992) (setting out same elements in slip-and-fall case). An owner or occupier of a premises does not owe an invitee the duty of an insurer. *CMH Homes*, 15 S.W.3d at 101.

The threshold issue in a premises liability claim is whether the defendant had actual or constructive knowledge of the allegedly dangerous condition. *Hall v. Sonic Drive–In of Angleton, Inc.*, 177 S.W.3d 636, 644 (Tex. App.–Houston [1st Dist.] 2005, pet. denied). "Ordinarily, an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place injury occurs, not some antecedent situation that produced the condition." *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006). The duty owed to an invitee in a premises liability case "depends on actual or constructive knowledge of a dangerous condition that a reasonable inspection would reveal," and as such, "an owner or occupier is not liable for deterioration of its premises unless it knew of or by reasonable inspection would have discovered the deterioration." *CMH Homes*, 15 S.W.3d at 101.

The Texas Supreme Court has noted that "there is no one test for determining actual knowledge that a condition presents an unreasonable risk of harm," but courts "generally consider whether the premises owner has received reports of prior injuries or reports of the potential danger presented by the condition." *Univ. of Tex.–Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008)

20

(per curiam). The "actual knowledge" required for premises liability "is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time." *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006) (per curiam). "Awareness of a potential problem is not actual knowledge of an existing danger." *City of Denton v. Paper*, 376 S.W.3d 762, 767 (Tex. 2012) (quoting *Reyes v. City of Laredo*, 335 S.W.3d 605, 609 (Tex. 2010)). Furthermore, "[c]onstructive knowledge is a substitute in the law for actual knowledge." *CMH Homes*, 15 S.W.3d at 102. Constructive knowledge is "what a person after a reasonable inspection ought to know or have reason to know." *Duncan v. First Tex. Homes*, 464 S.W.3d 8, 16 (Tex. App.—Fort Worth 2015, pet. denied).

In the context of slip-and-fall cases, the plaintiff satisfies the knowledge element by establishing one of three things: (1) the defendant placed a substance on the floor; (2) the defendant actually knew the substance was on the floor; or (3) it is more likely than not that the dangerous condition had existed long enough to give the premises owner a reasonable opportunity to discover it. *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002); *Bendigo v. City of Houston*, 178 S.W.3d 112, 114 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Temporal evidence, or evidence of the length of time the dangerous condition existed, is the

21

best indication of whether the premises owner had a reasonable opportunity to discover and remedy the situation. *Reece*, 81 S.W.3d at 816.

## 2. *ESA's knowledge of the dangerous condition*

ESA asserted in its motion for summary judgment that, as a matter of law, it did not have actual or constructive knowledge of the dangerous condition that caused Julia's injury.

ESA argued that it did not have actual or constructive knowledge of the dangerous condition because the evidence demonstrated that there was no problem with the refrigerator when the Marshalls checked into the room on January 1, 2015, and there was no problem with the refrigerator the following day when Dennis left the room at approximately 11:00 a.m. It is undisputed that no hotel employees entered the room between the time Dennis left and Julia fell later that afternoon, so, as a matter of law, ESA did not have actual knowledge of the leaking refrigerator. *See Thompson*, 210 S.W.3d at 603 (actual knowledge as required to establish premises liability "is of the dangerous condition at the time of the accident"). Furthermore, all of the summary judgment evidence indicated that the refrigerator was functioning normally when the Marshalls checked in. Nothing in the summary judgment evidence, including the maintenance records and deposition testimony, indicated that there had ever been a problem with the refrigerator in the Marshalls' room before Julia's fall. There was no evidence of any previous falls or

hazards caused by the refrigerator in the Marshalls' room or anywhere else on the property. *See Aguilar*, 251 S.W.3d at 513 (stating that, in establishing defendant's actual knowledge, courts consider "whether the premises owner has received reports of prior injuries or reports of the potential danger presented by the condition").

ESA further argues that, because the property was an extended-stay hotel that did not provide regular housekeeping, and the Marshalls opted not to pay the extra fee for daily housekeeping, no one from the hotel staff would have had an opportunity to enter the room, conduct an inspection, and discover the leaking refrigerator before Julia fell. Thus, it argued that, as a matter of law, it could not have had constructive knowledge of the leak, and it asserted that the Marshalls could produce no evidence establishing that ESA had constructive knowledge. *See Reece*, 81 S.W.3d at 816 (stating that circumstances to be considered in constructive notice analysis include proximity of employee to condition, length of time dangerous condition existed, as well as whether condition was conspicuous); *CMH Homes*, 15 S.W.3d at 102–03 (plaintiff can establish defendant's constructive knowledge "by showing that the condition had existed long enough for the owner or occupier to have discovered it upon reasonable inspection); *Duncan*, 464 S.W.3d at 16 (constructive knowledge is "what a person after reasonable inspection ought to know or have reason to know").

In response to this summary judgment argument, the Marshalls presented no evidence indicating that someone from ESA's staff had actual or constructive knowledge of the specific leak that caused Julia's fall. In their first issue, they instead argue that summary judgment was improper because ESA's motion did not address the unreasonably dangerous condition that they actually alleged—the Marshalls identified the dangerous condition as being the "refrigerator setup," including "the manner in which the refrigerator in Room 324 had been arranged and maintained," rather than the specific puddle of water in which Julia slipped and fell. In their second issue, they argue that they presented more than a scintilla of evidence on each element of their premises liability claim, including that ESA had actual and constructive knowledge that the refrigerator setup constituted an unreasonably dangerous condition.

The Marshalls rely on *Corbin v. Safeway Stores, Inc.*, and other cases that have recognized that "even in the absence of evidence showing the [owner's] actual or constructive knowledge of the presence on the floor of the specific object causing the fall," an owner may nevertheless be liable if the plaintiff can show that the owner/operator was aware of a high risk that the dangerous condition would occur. 648 S.W.2d 292, 295 (Tex. 1983); *see Crosby v. Minyard Food Stores, Inc.*, 122 S.W.3d 899, 901 (Tex. App.—Dallas 2003, no pet.); *see also Nat'l Convenience Stores v. Erevia*, 73 S.W.3d 518, 522–23 (Tex. App.—Houston [1st

24

Dist.] 2002, pet. denied) (holding convenience store owner liable for injury caused by water on floor near self-service display). The Marshalls assert that ESA created the unreasonably dangerous condition posed by the refrigerator setup because it installed "outdated" refrigerators on hard floors, the refrigerators regularly malfunctioned and were prone to leaking water, ESA was or should have been aware with reasonable inspection that the refrigerators were "regularly" malfunctioning and leaking water onto the floor, a refrigerator that leaks onto a hard floor creates an unreasonably dangerous slipping hazard, ESA was aware of this risk, and Julia slipped in a puddle of the water that accumulated.

However, the Marshalls' arguments on this issue misconstrue the evidence. There was no evidence of the actual age of the refrigerators on the property in general or of the refrigerator in the Marshalls' room at the time Julia fell. Jimenez testified that all of the refrigerators were replaced in 2016 because they were rusty and outdated, but he did not provide any evidence regarding rust or deterioration as of the time Julia fell in January 2015. Both Jimenez and Lauersdorf testified that, around the time leading up to Julia's fall, ESA regularly repaired and replaced refrigerators around the property, so the evidence does not support an inference that all of the refrigerators would have been approximately the same age before 2016. There was no evidence regarding the typical useful life of the refrigerators.

25

Likewise, there was no evidence that the refrigerators "regularly" malfunctioned or were "prone" to leaking water or to creating unreasonably hazardous conditions. The maintenance logs demonstrated that in the two years before Julia's fall, there were two reports of leaking refrigerators, but there was no evidence that these leaks constituted a hazard.[1] There was no evidence of any prior guests being injured as a result of the refrigerator setup. Lauersdorf testified that he did not know whether the number of repairs ESA made on its refrigerators could be considered a "high number," and he was unwilling to testify that he believed ESA's refrigerators needed repairs on "a regular basis."

Although the Marshalls rely on portions of Shepard's testimony indicating that she regularly saw refrigerators leaking, Shepard clarified that she saw between one and five refrigerators with leaks, and she stated that she saw them leaking into the bottom of the refrigerators themselves, not out onto the floor. Likewise, the Marshalls rely in part on Jimenez's testimony regarding the refrigerators being old and having problems that could cause leaks, but Jimenez's testimony on those issues was general. Jimenez testified that it was possible for refrigerators to leak in the manner described by the Marshalls, but he never testified that he himself observed such leaks on ESA's property before Julia's fall. Jimenez had no knowledge of the specific refrigerator that was in Room 324 at the time of Julia's

---

[1]     The Marshalls made multiple statements about ESA's poor recordkeeping, but they do not assert an evidentiary challenge or other error on this basis.

26

fall. And the fact that the Marshalls asserted that Lauersdorf brought towels to clean up the leaking water is no evidence that he knew about an existing dangerous condition before Julia's phone call to the front desk.

Taking the evidence actually presented in the light most favorable to the Marshalls, as we must, this case is distinguishable from *Corbin* and the other cases that the Marshalls rely upon. In *Corbin*, the Texas Supreme Court held that a self-service display for sampling grapes was itself a dangerous condition, and the storeowner could be held liable "even in the absence of evidence showing the storeowner's actual or constructive knowledge of the presence on the floor of the specific object causing the fall." 648 S.W.2d at 295. The supreme court noted that the self-service display held grapes in an "open, slanted bin above a green linoleum tile floor"; that the store's policy required keeping non-skid, non-slip mats in front of the display, but those were not present when the plaintiff fell; and that the storeowner admitted there was an "unusually high risk associated with its grape display." *Id.* at 294–96.

Here, by contrast, there was no evidence that the placement of the refrigerators within the rooms was itself unreasonably dangerous, and there was no evidence that ESA admitted or knew of any unusually high risk associated with its refrigerators. At most, the evidence establishes that there was the potential for the refrigerators to leak. Subsequent authority from the supreme court itself indicates

27

that "[a]wareness of a potential problem is not actual knowledge of an existing danger." *Paper*, 376 S.W.3d at 767; *see also Taylor*, 222 S.W.3d at 408 ("A condition is not unreasonably dangerous simply because it is not foolproof.").

In *CMH Homes*, the supreme court considered a premises owner's liability for conditions that, although originally safe, might become unsafe over time. 15 S.W.3d at 101. In *CMH Homes*, the plaintiff allegedly "injured his back when he stepped onto unstable steps while carrying a heavy load." *Id.* at 98. The supreme court assumed that CMH "had actual knowledge that the step and platform would become unstable and would present an unreasonable risk of injury after twelve to fifteen months simply by virtue of its use." *Id.* at 100–01. It was also "undisputed" that CMH knew that the steps could be damaged and become unsafe "immediately." *Id.* at 101. Nevertheless, the supreme court concluded that this was no evidence that CMH knew about the particular condition that injured the plaintiff in that case, distinguishing the facts from those in *Corbin*, and holding that "an owner or occupier is not liable for deterioration of its premises unless it knew of or by reasonable inspection would have discovered the deterioration." *Id.* It held:

> Many building materials will, over time, deteriorate and require repair or replacement. That does not necessarily mean that the owner or occupier has created a dangerous condition or that the owner has actual or constructive knowledge of a dangerous condition. For example, we know that asphalt roads will develop potholes over time and will require repair. That does not mean that asphalt roads constitute an unreasonable risk of harm from the day they are constructed. There may be situations in which the deterioration of a

28

structure or fixture is so rapid that there is an unreasonable risk of harm from the outset of its construction or installation, but this is not such a case.

There is no evidence that the step and platform unit on which Danean [the plaintiff] was injured was a dangerous condition from the inception of its use. In the past, units had been sufficiently strong to withstand daily and heavy use. They held up under a constant stream of deliveries of air conditioning units, refrigerators, and other heavy items. It was only at some point in time after installation that the unit could pose an unreasonable risk of harm due to deterioration.

The fact that units occasionally had become unstable when trucks hit them is not evidence that the units were unreasonably dangerous when first installed. An owner's or occupier's knowledge of prior incidents of damage to a premises would bear on the reasonableness of inspections and the reasonableness of the care exercised by the owner or occupier to make the premises safe. But a premises owner or occupier is not strictly liable for defects on its premises. There is no evidence that CMH failed to use reasonable care to determine whether a truck had hit the unit or that reasonable inspection of the unit would have revealed that it had been hit by a truck and had become unstable.

*Id.* at 101.

Similarly, here, there is no evidence that the refrigerator setup used in the Marshalls' room was unreasonably dangerous from the inception of its use. The fact that the refrigerator might malfunction over time is not evidence that ESA created a dangerous condition or that it had actual or constructive knowledge of a dangerous condition. Even in light of the evidence that two refrigerators had leaked in the past and that on one to five occasions Shepard had seen refrigerators that had leaked into the bottom of the refrigerator itself, there is no evidence indicating that ESA was on notice of an unreasonably dangerous condition warranting additional

inspections or other actions. Rather, the evidence indicated there was no problem with the refrigerator in Room 324 before the Marshalls' arrival, there was no problem with the refrigerator when the Marshalls checked into the room, and Dennis did not notice any problem with the refrigerator or a leak near the refrigerator when he left the room the morning of Julia's fall. *See id.*; *see also Taylor*, 222 S.W.3d at 408 (rendering take-nothing judgment against plaintiff who alleged she fell on partially melted ice near beverage dispenser, observing in relevant part "No evidence suggests that the soft drink dispenser was set up in such a way that ice on the floor was a greater danger than one would ordinarily encounter with such dispensers, or that customers, though prone to spills, were any more prone around this dispenser.").

Thus, we conclude that this case is distinguishable from *Corbin*, and is, instead, analogous to *CMH Homes* and *Taylor*. The other cases relied upon by the Marshalls, like *Crosby* and *Erevia*, are likewise distinguishable. In *Crosby*, the plaintiff fell on a mat in the entry of a grocery store, and she "presented evidence that the mat frequently became buckled due to heavy foot traffic in and out of the store." 122 S.W.3d at 901. The plaintiff also presented the testimony of a store employee who "testified that he had to straighten the mat between 48 and 86 times during an eight hour shift" and "accident reports signed by the store's managers showing that several people had tripped and fallen on the mat within a few weeks

30

before [the plaintiff's] accident." *Id.* The court in *Crosby* acknowledged the supreme court's holdings in cases like *CMH Homes*, but ultimately determined that, as in *Corbin*, there was evidence that the mat itself was unreasonably dangerous: "In the case before us, the mat did not become unsafe over time but was unsafe from the moment it was put on the floor because of its tendency to buckle frequently when subjected to foot traffic." *Id.* at 901–02 (also observing that "[a] claim that something used by the storeowner is inherently dangerous is fundamentally different than a claim that a dangerous condition arose in the store and caused injuries"). By contrast, in the present case, there is no evidence that the refrigerator setup was unsafe from the moment it was installed, and there were no previous incidents of hazardous leaks or prior falls that could have alerted ESA to a potential danger.

*Erevia*, like *Crosby*, involved materially different evidence from that present here. In *Erevia*, the plaintiff was injured when she slipped on water leaking from an ice-filled barrel in a convenience store. 73 S.W.3d at 522. The court in *Erevia* noted that the supreme court had held previously that "the mere fact that a store has a customer sampling display cannot, without more, be evidence of a condition on the premises that poses an unreasonable risk of harm." *Id.* at 522–23 (quoting *H.E. Butt Grocery Co. v. Resendez*, 988 S.W.2d 218, 219 (Tex. 1999) (per curiam) (distinguishing Resendez's injury from grape that had fallen from a sampling

display from circumstances in *Corbin* in determining that display that injured Resendez was not inherently dangerous)). However, it held that Erevia proved "much *more* than the mere presence of a self-service display," observing that the store's manager had "testified that water on floors was recognized as a hazard because it endangered the safety of employees and customers" and that the company's "safety workbook's instructions that absorbent mats should be placed under iced barrels" had not been followed at the time Erevia was injured. *Id.* at 523. Here, however, there was no evidence that ESA was aware of a hazard presented by the refrigerators or that it had failed to comply with any safety requirements.

Accordingly, we conclude that the Marshalls failed to produce evidence raising a fact question on whether ESA had actual or constructive knowledge of the dangerous condition that resulted in Julia's fall and injury. The trial court did not err in granting summary judgment. We further overrule the Marshalls' assertion that the trial court erred in granting summary judgment in favor of ESA because the motion for summary judgment did not challenge the dangerous condition actually alleged by the Marshalls. As indicated by the above analysis, the summary judgment motion and the responses and evidence filed addressed the Marshalls' pleadings—that ESA negligently placed poorly maintained refrigerators on hard

32

floors, that a leak could have been foreseen and did in fact occur, resulting in Julia's fall—and supported the trial court's judgment. *See* TEX. R. CIV. P. 166a.

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.