**Opinion issued February 27, 2026**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

**NO. 01-24-00088-CV**

—————————————

**ONCOR ELECTRIC DELIVERY COMPANY LLC, Appellant**

**V.**

**MARICELA RAMIREZ AND HERMAN RENDON, AS NEXT FRIEND OF W.R., A MINOR, Appellees**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-72458**

---

## O P I N I O N

Juan Carlos Ramirez was working as a pumper at a wellsite when he saw a brushfire, went to investigate it, and was electrocuted by a sagging high voltage power line. His wrongful death beneficiaries sued Oncor (the electric company), arguing negligence.

Oncor sought summary judgment on the affirmative defense that Ramirez qualified as a "person responsible" under Chapter 752 of Texas's Health and Safety Code and had to comply with Chapter 752's requirements—but did not.[1]

Chapter 752 says that a person or entity "responsible for temporary work or a temporary activity or function closer to a high voltage overhead line" than six feet must give the electric company 48 hours' notice "before the work begins." TEX. HEALTH & SAFETY CODE § 752.003(a). It continues that, before the work, activity, or function can begin, the person or entity responsible, together with the electric company, must make a plan (to deactivate the line or otherwise make it safe), and the person or entity responsible must pay the costs of that plan. *Id.* § 752.003(b), (c). And, the statute states, a violation of these requirements is a criminal offense; a violator also bears liability for harm to the line. *Id*. §§ 752.007, 752.008.

Oncor's summary-judgment position was premised on the argument that these requirements applied to Ramirez. The trial court denied Oncor's motion for summary judgment.

---

[1] Our Court has previously held that Chapter 752's indemnity provision prevents a violator of the statute from recovering from the power company. *Wolfenberger v. Houston Lighting & Power Co.*, 73 S.W.3d 444, 447–48 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). No party argues otherwise.

The parties dispute the propriety of the trial court's summary-judgment denial, and a panel of our Court granted a permissive appeal of that order.[2] The permissive appeal asks whether "an employee who decides to investigate a brush fire, and is electrocuted by a power line while doing so, [can] be a 'person responsible' for purposes of Chapter 752 [of Texas's Health and Safety Code]?"

We agree with the trial court's summary-judgment determination. When a movant seeks summary judgment on an affirmative defense, as here, that party (Oncor) "must conclusively establish each element of its affirmative defense." *First Sabrepoint Cap. Mgmt., L.P. v. Farmland Partners Inc.*, 712 S.W.3d 75, 84 (Tex. 2025). But Oncor did not conclusively prove that Ramirez qualified as a "person responsible" under the statute. At the least, fact questions precluded summary judgment for Oncor on this record. We thus affirm.

## BACKGROUND

Our recitation of the facts is taken from the parties' summary-judgment evidence. As this is an appeal from the denial of a traditional summary-judgment motion, we view the evidence in the light most favorable to the nonmovants, indulging every reasonable inference in their favor and resolving any doubts against the motion. *See Inwood Nat'l Bank v. Fagin*, 706 S.W.3d 342, 347 (Tex. 2025).

---

[2] Under the permissive appeal statute, the "order" is before us. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f); TEX. R. APP. P. 28.3(a)–(c), (e)(2)(A), (e)(4); *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 147 (Tex. 2022).

Ramirez was an employee of Lujan Lease Works, Inc., which does business as Snapp Lease Works. Snapp is a contractor of Citation Oil & Gas Corporation.

Under its contract with Citation, Snapp acts as a "contract pumper." In essence, when one of Citation's own pumpers is unavailable, Snapp provides one of its employees to fill in as a pumper. Ramirez was one of Snapp's fill-in employees.

"Pumper," also known as a "lease operator," is the oil and gas industry term for a person who records and reports various data from wellsite oil storage tanks. Zachry Crockett, an employee of Citation who served as assistant production foreman and (taken in the light most favorable to the nonmovants) was acting as Ramirez's point of contact at the time of the accident,[3] described a pumper's job duties as: acquiring data, figuring out the amount of production, and making rounds to individual wells to "see if there w[ere] any issues, report anything back."

On the day of the accident, Ramirez was filling in for one of Citation's employees. While making his rounds, Ramirez spotted a brushfire.

Ramirez reported the fire to his point of contact at Citation, Crockett. There is summary-judgment evidence that Ramirez told Crockett he was going to put out

---

[3] The Citation employee for whom Ramirez was filling in on the day of the accident—William Fuller—testified that Crockett, as the assistant foreman, "instructed us day to day" and that Fuller "pretty much directly reported to him." Evidence also showed that Ramirez was supposed to turn in the data he recorded to Crockett or the Citation pumper for whom he was filling in.

the fire.[4] Crockett informed Ramirez that he would make some telephone calls about the brushfire and then call Ramirez back.

Ramirez went to investigate. When Crockett called Ramirez back for an update on the situation, Ramirez answered—but shortly afterward yelled. Crockett said the yell was followed by heavy breathing, and then Ramirez made no further response. This prompted Citation to dispatch one of its employees to Ramirez's reported location to check on Ramirez.

Ramirez was found dead. His body lay next to one of Oncor's high voltage overhead lines, which was sagging about two feet or so off the ground due to a damaged utility pole. No one disputes that Ramirez was electrocuted.

The brushfire consumed five acres before firefighters put it out. The volunteer fire chief, who was on the scene before the fire was put out, testified that he did not immediately see the downed line when he approached it because it was smoky. Witnesses said they could tell the line was energized because it emitted a humming noise.

It is undisputed that no one at Citation or Snapp instructed Ramirez to investigate the fire at the outset, before Ramirez reported the fire to Crockett. But

---

[4] A police report in the summary-judgment record states that Crockett said that Ramirez told Crockett during their telephone call that he was going to try to put out the fire. Crockett testified in his deposition that the police report was mistaken. For purposes of summary judgment, we take the facts in the light most favorable to the nonmovants.

there is also no evidence that Ramirez was instructed to stop investigating it either. Uncontradicted evidence shows that the safety policies of both companies instruct employees to report any fire that cannot be extinguished with a small fire extinguisher, so firefighters can be called to fight the fire. The record is uncertain as to what fire-safety training, if any, Ramirez may have received.

Oncor owns the high voltage overhead line at issue. Oncor was not notified that Ramirez would be within six feet of the line.

## DISCUSSION

When, as here, a trial court's order denying summary judgment is reviewable, we review it de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). We also interpret statutes de novo. *Ferchichi v. Whataburger Rests. LLC*, 713 S.W.3d 330, 337 (Tex. 2025); *see also Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 619 (Tex. 2022) (summary judgment turned on statutory interpretation, which presents a question of law).

The outcome of this appeal turns on the interpretation of Chapter 752 and then application of that statute to this record.

## Chapter 752

In interpreting a statute, its text is our lodestar. *See Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, 715 S.W.3d 383, 387 (Tex. 2025). Absent statutory definitions, we interpret the words of a statute in accord with their plain and common

meaning, unless another meaning is apparent from context or application of the plain meaning leads to absurd results. *Ferchichi*, 713 S.W.3d at 337; *Amazon.com, Inc. v. McMillan*, 625 S.W.3d 101, 106 (Tex. 2021).

Start with section 752.003. It says that "[a] person, firm, corporation, or association *responsible* for temporary work or a temporary activity or function" near (within six feet of) a "high voltage overhead line[5]. . . must notify the operator of the line at least 48 hours before the work begins." *See* TEX. HEALTH & SAFETY CODE § 752.003(a) (emphasis added); *see also id.* §§ 752.004(a), 752.005 (imposing the six-foot distance requirement that applies throughout statute).

The statute continues that a "person, firm, corporation, or association may not begin the work, activity, or function under this section until the person [or other qualifying entity] responsible for the work, activity, or function and the owner or operator, or both, of the high voltage overhead line have negotiated a satisfactory mutual arrangement" to "provide temporary de-energization and grounding,

---

[5] There is an additional potential question of whether the line here qualifies as an "overhead line." "Overhead line" is defined in the statute as "a bare or insulated electrical conductor *installed* above ground but does not include a conductor that is de-energized and grounded or that is enclosed in a rigid metallic conduit." TEX. HEALTH & SAFETY CODE § 752.001(2) (emphasis added). This definition does not include a specific height requirement to qualify as "overhead"—it says above ground. The line must also be "installed." *See, e.g.*, NEW OXFORD AM. DICTIONARY 900 (3d ed. 2010) (defining "install" as to "place or fix (equipment or machinery) in position ready for use"). The parties did not brief the question of whether this line qualifies as an "overhead line," and we do not reach it in affirming the denial of summary judgment for Oncor.

temporary relocation or raising of the line, or temporary mechanical barriers to separate and prevent contact between the line and the material or equipment or the person performing the work, activity, or function." *Id.* § 752.003(b). And it requires the person or entity responsible for the work, activity, or function to pay the operator of the line the "actual expense incurred by the operator in providing the clearance prescribed in the agreement." *Id.* § 752.003(c).

Next, section 752.004 provides that, unless a person or entity "effectively guards against danger by contact with the line as prescribed by Section 752.003" (*i.e.*, unless they give 48-hours' notice, make the plan to de-energize or relocate the line, etc.), "the person [or other qualifying entity] . . . may not perform a function or activity on land, a building, a highway, or other premises if at any time it is possible that the person performing the function or activity may: (1) move or be placed within six feet of a high voltage overhead line while performing the function or activity." *Id.* § 752.004(a)(1). (Subsection (a)(2) addresses the person bringing any tool, equipment, machine, or material within six feet of the line while performing the function or activity.)[6]

---

[6] By its terms, Chapter 752 does not apply to "the construction, reconstruction, operation, or maintenance by an authorized person of overhead electrical or communication circuits or conductors and their supporting structures and associated equipment that are part of a rail transportation system, an electrical generating, transmission, or distribution system, or a communication system." *Id.* § 752.002(a). An "authorized person" includes, for example, "an employee of a light and power company, an electric cooperative, or a municipality working on his employer's electrical system" and "an

A violation of Chapter 752 is a crime punishable by fine and jail time. *See id.* § 752.007 (fine between $100–$1,000; jail for not more than one year).

Chapter 752 also imposes civil consequences: "If a violation of this chapter results in physical or electrical contact with a high voltage overhead line, the person, firm, corporation, or association that committed the violation is liable to the owner or operator of the line for all damages to the facilities and for all liability that the owner or operator incurs as a result of the contact." *Id.* § 752.008. Our Court has previously held this provision prevents recovery by the violator from the power company. *Wolfenberger v. Houston Lighting & Power Co.*, 73 S.W.3d 444, 447–48 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

## Analysis

### I. Under its plain terms, Chapter 752 applies to persons or entities "responsible" for temporary work, activity, or function near a line.

As explained, Chapter 752's requirements apply to "[a] person . . . responsible for temporary work or a temporary activity or function closer to a high voltage overhead line than the distances prescribed." TEX. HEALTH & SAFETY CODE § 752.003(a). The dispositive word here is "responsible."

The statute does not define the term "responsible." *See id.* § 752.001 (definitions). Accordingly, we turn to the plain and common meaning of the term.

---

employee of a transportation system working on the system's electrical circuits." *Id.* § 752.002(b)(1)–(2).

9

Chapter 752 was enacted in 1989 (premised on a 1970s statute). *See McCaughtry v. Barwood Homes Ass'n*, 981 S.W.2d 325, 334 & n.7 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Sun Oil Co. v. Massey*, 594 S.W.2d 125, 130 (Tex. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (original statute—article 1436c of civil statutes—enacted in 1971).

Then, as now, "responsible" generally means "[a]nswerable, accountable (*to* another *for* something); liable to be called to account." 13 OXFORD ENGLISH DICTIONARY 742 (2d ed. 1989) (emphasis in original); *see also* WEBSTER'S NEW COLLEGIATE DICTIONARY 979 (1981) (defining "responsible" in relevant part as "liable to be called to account as the primary cause, motive, or agent"); WEBSTER'S THIRD NEW INT'L DICTIONARY 1935 (1976) (defining "responsible" in relevant part as "answerable as the primary cause, motive, or agent whether of evil or good: creditable or chargeable with the result").[7]

Of course, terms must be read in context. And other terms in Chapter 752 further qualify what it means to be a person or entity "responsible" under this provision. *See Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015) (term's use in the context of the statute can impart more precise meanings); *see also*

---

[7]   The definition of "responsible" has not changed. *See, e.g.*, NEW OXFORD AM. DICTIONARY 1488 (3d ed. 2010) (defining term in relevant part as being "primary cause of something and so able to be blamed or credited for it").

*Tex. Comm'n on Env't Quality v. Maverick Cnty.*, 642 S.W.3d 537, 546 (Tex. 2022) ("[W]e are not in a vacuum. We are applying the text of the rule. And the rule itself tells us what kind of operation it envisions—'*overall* operation.'") (emphasis in original).

Here, the statute tasks a person or entity "responsible" with the following obligations:

- "notify the operator of the line at least 48 hours before the work begins";

- "negotiate" a "satisfactory mutual arrangement" with the owner or operator (or both) of the line to temporarily de-energize and ground the line, temporarily relocate or raise the line, or provide "temporary mechanical barriers to separate and prevent contact between the line and the material or equipment or the person performing the work, activity, or function"; and

- "pay the operator of the high voltage overhead line the actual expense incurred by the operator in providing the clearance prescribed" in the negotiated agreement.

TEX. HEALTH & SAFETY CODE § 752.003(a)–(c) (cleaned up).

The statute presumes that a person or entity "responsible" could theoretically do those things—whether they do them or not.[8] *See Massey*, 594 S.W.2d at 131 (discussing workman's lack of authority to do such things).

---

[8] We note that the terms of the statute task a person or entity responsible for a qualifying "temporary work or a temporary activity or function" with giving the required notice. *See* TEX. HEALTH & SAFETY CODE § 752.003(a). This raises an additional question: under the statute's terms, is the statute's application limited to instances in which a person or entity responsible could conceivably stop and give notice—or does the statute cover even an unaware and accidental stumbling on an obscured line? Put differently, does the statute require some awareness that an activity, work, or function takes one

## II. The trial court properly denied Oncor's motion for summary judgment.

### A. To prevail, Oncor had to conclusively prove that Chapter 752 applied to Ramirez and that Ramirez violated the chapter.

Oncor's Chapter 752 defense is an affirmative defense. *See Wolfenberger*, 73 S.W.3d at 447–48 (section 752.008 provides an "affirmative defense of statutory indemnity"). Thus, to obtain summary judgment, Oncor bore the burden to conclusively prove the chapter's applicability (and a violation). *First Sabrepoint Cap. Mgmt.*, 712 S.W.3d at 84 (movant seeking summary judgment on affirmative defense "must conclusively establish each element of its affirmative defense"); *Wolfenberger*, 73 S.W.3d at 446–48 (party moving for summary judgment under Chapter 752 has "the burden to prove its entitlement to that defense conclusively," including that person injured by line was "person responsible" for the temporary activity, work, or function near the line).

Evidence is conclusive if reasonable people could not differ in their conclusions about it. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Typically, evidence is conclusive when a party admits it is true or it concerns

---

within six feet of a high voltage line, so notice (or avoiding contact with the line) is conceivably possible? Does it, at the least, require recklessness? Or does the statute—which criminalizes violations—essentially create a strict liability crime (and can it do so)? *See* TEX. PENAL CODE § 6.02(b) ("If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element."); *see also id.* § 1.03(b). No party has briefed this issue or how it applies to the facts of this case, and we do not need to address it to affirm the Order on review.

undeniable physical facts. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017). As our Court recently stated: conclusive evidence includes "undisputed evidence that allows just one logical inference, undisputed evidence of undeniable physical facts, undisputed evidence admitted to be true, and disputed evidence that definitively negates contrary proof in some fashion, such as a scientifically reliable diagnostic test establishing paternity in the face of contrary testimony." *Prosper Florida, Inc. v. Spicy World of USA, Inc.*, 649 S.W.3d 661, 671 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

Unless the evidence is conclusive, a factfinder must weigh the evidence and the credibility of the witnesses. *Id*. Moreover, if a movant initially carries its burden, the nonmovants could defeat summary judgment by then raising a genuine issue of material fact. *See Premium Plastics Supply, Inc. v. Howell*, 537 S.W.3d 201, 204 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

### B. The summary-judgment evidence does not conclusively prove that Ramirez was "responsible" under Chapter 752.

The summary-judgment evidence does not conclusively show that Ramirez—a pumper who was making his rounds between wells when he discovered a brushfire, went to investigate it, and was then electrocuted—was a "person responsible" under Chapter 752.

Start with the ordinary meaning of "responsible." The evidence—which we must view in the light most favorable to the nonmovants, Ramirez's wrongful death

13

beneficiaries—does not show conclusively that Ramirez was "answerable, accountable," or "liable to be called to account" for (or liable or answerable as a primary agent or "creditable or chargeable with the result" of) temporary work or activity near the line.

Viewed in the light most favorable to the nonmovants, evidence shows that Ramirez was at work—acting as a pumper, within the scope of his employment—when he discovered a brushfire and attempted to investigate it. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131–32 (Tex. 2018) (employee is within scope of employment when he is discharging duties generally assigned to him or of same general nature as or incidental to generally assigned duties; employee is outside scope of employment when he deviates from performance of those duties for his own purposes). Oncor disputes that Ramirez was acting within the scope of his employment when he investigated the fire, but at a minimum, the record presents a fact issue on that point.[9]

---

[9] Oncor argues that "the evidence conclusively establishes that Mr. Ramirez was *not* acting in the course and scope of his employment" at the time of his electrocution. (Emphasis in original.) But viewing the summary-judgment record in the light most favorable to the nonmovants, we disagree. *See Painter*, 561 S.W.3d at 131–32; *see also Laverie v. Wetherbe*, 517 S.W.3d 748, 754 (Tex. 2017) (employee's act "not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer") (quotation marks and citation omitted).

Oncor says the evidence shows Ramirez disobeyed the fire-safety policies of both Snapp and Citation, which require pumpers to notify authorities in the event of a brushfire, rather than investigate or fight it. Oncor similarly argues that policy

Evidence shows that Ramirez was working as a "pumper" for Snapp, a company that provides pumpers to fill in when Citation's pumpers are not available. A pumper records and reports various data from wellsite oil storage tanks. According to Citation's assistant production foreman, Zachry Crockett, who (taken in the light most favorable to the nonmovants) was acting as Ramirez's point of contact at the time of the accident, a pumper's job duties are acquiring data, figuring out the amount of production, and making rounds to individual wells to "see *if there w[ere] any issues*, report anything back." (Emphasis added.)

Prior to the accident, Crockett met with Ramirez "to make sure that he knew the route he was supposed to be on, make sure he knew the numbers he was supposed to be getting, make sure everything was good." And the day before the incident,

---

prevented going near a sagging power line. But evidence exists that Ramirez would not have received Citation's safety training as an employee of a Snapp—a Citation contractor. And Snapp's safety training consultant testified that he could not say whether Ramirez ever attended Snapp's training. Moreover, the record concerning Ramirez's phone calls reporting the fire does not reflect any instruction not to investigate; instead, viewed in the light most favorable to the nonmovants, it reflects Ramirez's point of contact following up with Ramirez to get an update. The evidence is far from conclusive as to whether Ramirez was aware of the policies that Oncor asserts he disobeyed.

In any event, Ramirez's purported failure to heed company policy would not, as a matter of law, render his investigation outside the scope of his employment. "[A]n employee may be acting within the scope of his employment even if he is acting against the express orders of his employer." *Raymond James & Assocs., Inc. v. Christensen*, 714 S.W.3d 886, 897 (Tex. App.—Houston [1st Dist.] 2025, pet. denied). His asserted disobedience would be a factor for a factfinder to consider in resolving whether he was acting within the course of his employment. *Id.*

15

Crockett texted Ramirez and told him to "[l]et me know if you come across anything."

The record then shows that, while conducting his work (which included making rounds to wells to see if there were any issues and reporting back), Ramirez noticed a brushfire. It is undisputed that Ramirez called to notify Crockett, the Citation assistant production foreman, about the brushfire. There is summary judgment evidence that Ramirez told Crockett that he was going to put the fire out.

Crockett, in turn, told Ramirez that he would make some telephone calls and get back to Ramirez. In his written accident statement, Crockett said he made a few calls and then called Ramirez back "to get an update." It was during this phone call with Crockett that Ramirez yelled in distress and then eventually fell silent.

Oncor said that Ramirez entered a utility easement while investigating the fire, and there is no evidence that Ramirez was told to do so. But there is also no evidence that Ramirez was told by his employer or anyone else not to investigate further when he called to report the fire. Nor is there evidence that the Citation assistant production foreman that he reported to (Crockett) told him to turn around, to leave the fire, or to otherwise stop investigating. And evidence shows that Crockett stayed in communication with Ramirez after Ramirez reported the situation; Crockett called back to get an "update" from Ramirez. Again, Ramirez was on the phone with

16

Crockett at the time that he came into contact with the high voltage line and was electrocuted.

Viewing the evidence in the light most favorable to the nonmovants, we cannot conclude that the record conclusively shows that Ramirez falls under the ordinary meaning of a "person responsible" for temporary work or temporary activity (however that work or activity is characterized here) within six feet of a high voltage line. At the least, the record presents a fact question for a jury on this point.

And importantly, reading the statutory terms in context—as we must—confirms our conclusion. This record does not show (conclusively or even at all) that Ramirez could do the things the statute tasks a "person responsible" with doing.

There is no evidence showing Ramirez was authorized to negotiate agreements on behalf of his employer, Snapp, or the company Snapp contracted to do work for, Citation. Nothing suggests he had any ability to negotiate the requisite agreement with Oncor to de-energize or otherwise make safe high voltage overhead lines. Nor is there any evidence in the record regarding Ramirez's authority to incur payment obligations on behalf of Snapp or Citation, including an obligation to pay the actual expense of de-energizing the line or otherwise making the line safe. If anything, Ramirez's call to Crockett, and Crockett's response that he would get back to Ramirez (along with his return phone call), suggest that Ramirez did not in fact have the authority to take such actions for the companies. (Moreover, viewing the

17

evidence in the light most favorable to the nonmovants—including the testimony of the fire chief that he did not immediately see the downed line because it was smoky—it is not clear that Ramirez was even aware he was going within six feet of a line.)

Under the terms of this statute, on this record, we conclude the trial court did not err in denying summary judgment to Oncor. *See, e.g.*, *First Sabrepoint Cap. Mgmt.*, 712 S.W.3d at 86 ("We agree with the court of appeals that Sabrepoint failed to conclusively establish the affirmative defense of collateral estoppel . . . ."); *Wolfenberger*, 73 S.W.3d at 449 ("We conclude that HL & P's evidence standing alone did not prove conclusively as a matter of law that Ronnie was within six feet of the power line, and in any event, Ronnie's evidence raised a fact issue.").[10]

An examination of analogous caselaw bolsters this conclusion. To begin, our conclusion aligns with this Court's decision in *Massey*, which addressed a prior

---

[10] To the extent Oncor's position is that the record shows that Ramirez was obligated to negotiate an agreement with Oncor to de-energize the line (as well as to pay to effect that agreement) *on his own behalf*—as opposed to for his employer—we reject Oncor's argument. As explained, *see supra* note 9, contrary to Oncor's assertion, the summary-judgment evidence does not conclusively show Ramirez was acting in his personal capacity for his own purposes—rather than acting as an employee of a company—when he encountered the line and was electrocuted. *See Massey*, 594 S.W.2d at 131–32 (observing that no evidence at trial showed workman at issue had authority to negotiate for or bind his employer, and distinguishing *Tull v. San Patricio Elec. Coop., Inc.*, 564 S.W.2d 192 (Tex. App.—Corpus Christi–Edinburg 1978, writ ref'd n.r.e.), as a case in which electrocuted crane operator "was his own employer" and was obligated to comply with statute).

version of this statute (in a post-trial appeal). 594 S.W.2d at 127.[11] There, an oil well owner hired a contractor to rework a well. *Id.* While securing a rig, several of the contractor's employees were electrocuted when a wire came into contact with a high voltage overhead line. *Id.* In the lawsuit between one of the employee's next of kin and the well owner, the next of kin prevailed at trial on a theory of negligence. *Id.* at 127–28. On appeal, the well owner argued the jury's finding that the electrocuted employee was not negligent was erroneous because, the owner asserted, the employee's failure to comply with the requirements of Chapter 752's predecessor constituted negligence as a matter of law. *Id.* at 130, 132. Thus, like this appeal, *Massey* involved an argument that the (predecessor) statute's requirements applied to the subordinate worker at issue.

Adopting reasons similar to ours here, the *Massey* court rejected that argument, holding that the deceased workman was not "responsible" under the statute and record there. *Id.* at 131. The Court emphasized that—like here—the record contained no evidence that the deceased, "a subordinate employee," had any authority to negotiate the agreement required by the statute or to obligate his employer (or the company that hired his employer) to pay the expenses of such an agreement. *Id.* The Court also explained that the "individual workman" performed

---

[11] The current version of the statute is not identical to the predecessor version, but the two are very similar.

the acts at issue in the course of his employment (in that case, it was also at the direction of the employer). *Id.* (stating that reasonable construction of predecessor statute "would not hold an individual workman responsible for a violation of the statute by his employer").

Other decisions have adopted similar reasoning, looking to their particular records and the situations at issue. For instance, in addressing whether the danger posed by a high voltage line was open and obvious to electrocuted workmen, the Texas Supreme Court noted that the workmen at issue there "were not responsible for the work." *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 777–78, 789–90 (Tex. 2021) (evidence showed their boss was on site during project and at time of accident, boss interacted with property owner's project manager about status of line, and workmen could have reasonably assumed that whoever was responsible for the work had fulfilled their duty under Chapter 752); *see also Ringo v. Gulf States Utils. Co.*, 569 S.W.2d 31, 32–34 (Tex. App.—Beaumont 1978, writ ref'd n.r.e.) (determining that worker—who was a minor—was not responsible on that record; he lacked authority to negotiate with power company or to bind company in agreement to pay expenses);[12] *cf. Trail v. Friedrich*, 77 S.W.3d 508, 511–13 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (Trail (an

---

[12] *See also Moore v. Sw. Elec. Power Co.*, 737 F.2d 496, 500 n.5 (5th Cir. 1984) (noting that "an employee typically has no authority to negotiate with the power company or bind his employer to an agreement to pay for any necessary precautionary measures").

independent contractor) was, per his testimony, "the person in charge of and responsible for the work"; he was "responsible for the work as contemplated in chapter 752").[13]

Applying the statute's plain terms to this record, and consistent with this precedent, we affirm the trial court's denial of summary judgment to Oncor.

## C. Oncor's arguments to the contrary do not support reversal.

Oncor nevertheless argues that it was entitled to summary judgment. Oncor argues that scope of employment is irrelevant to the analysis. Oncor urges us to apply a test our Court has looked to at times in analyzing the potential responsibility of an independent contractor or the person who hired him: control over the details of the work. *See, e.g.*, *Oxy USA WTP LP v. Bringas*, 702 S.W.3d 647, 665–66 (Tex. App.—Houston [1st Dist.] 2024, pet. denied) (focusing on control over the details of the

---

[13] Questions concerning this statute arise in a variety of contexts. *See e.g.*, *Buchan v. All. Cmtys., LLC*, No. 01-18-01088-CV, 2020 WL 3969670, at *4 (Tex. App.—Houston [1st Dist.] July 14, 2020, no pet.) (evidence showed property manager was not "person responsible" under Chapter 752; it was not contractually responsible, did not control work, and did not direct tasks performed); *Oncor Elec. Delivery Co. LLC v. Quintanilla*, No. 05-19-01331-CV, 2022 WL 9809712, at *9–14 (Tex. App.—Dallas Oct. 17, 2022, pet. denied) (affirming jury finding that worker electrocuted while working near a power line was not responsible under Chapter 752 under the charge as given—which was given without objection).

*Presley v. Gulf States Utilities Company*, relied on by Oncor (and distinguishing *Ringo*, 569 S.W.2d at 32–34), is both distinct on its facts and also not binding precedent. No. 09-10-00039-CV, 2010 WL 4264097, at *5–7 (Tex. App.—Beaumont Oct. 28, 2010, pet. denied) (addressing situation where employee's actions were directly contrary to direction from employer and employer was unaware that employee was disobeying direction).

work in concluding that owner of facility, who hired independent contractors to swap out bins near lines and lacked control over those independent contractors, was not responsible under the statute); *Trail*, 77 S.W.3d at 511–13 (addressing independent contractor). Oncor also argues that Ramirez must be responsible here. We disagree.

As an initial matter, we point Oncor to our analysis above, which applies the statute's terms to this record. We also note that Oncor's suggested "control over the details of the work" test is unlikely to be particularly helpful in the context of an ordinary, subordinate worker acting within the scope of his employment. As far as employees within the scope of their employment are concerned, the employer generally has control over the details of the employee's work. *See Painter*, 561 S.W.3d at 132 (employer's right to control details of work "is what principally distinguishes an employee from an independent contractor" and "this right to control extends to all the employee's acts within the course and scope of his employment").

Moreover, even if we were to apply this test, it would not lead to a different outcome. As explained above, viewed in the light most favorable to the nonmovants, the summary-judgment evidence reflects that Ramirez was making rounds as a pumper to "see if there w[ere] any issues, report anything back" when he discovered a fire. Evidence reflects Ramirez's call to his work point of contact, Crockett, in which Ramirez reported the fire. Evidence reflects Crockett's response that he would make some calls and get back to Ramirez. And evidence reflects the return call from

Crockett for an "update" from Ramirez on the situation—as well as Ramirez's electrocution while on that call. The record does not conclusively show Ramirez exercised control over the details of the work or activity near the line. At the least, this presents a fact question for the jury.

As a final matter, Oncor argues that Ramirez must be responsible because he was the lone person at the scene of the accident, and neither Snapp nor Citation was aware of the sagging line. Oncor argues that, due to this, neither company could conceivably be responsible for purposes of Chapter 752. But the only issue before us is whether Oncor has conclusively shown that *Ramirez* was "responsible." *See Los Compadres Pescadores*, 622 S.W.3d at 789–90 (whether property owner was "responsible" under Chapter 752 was irrelevant to question of whether energized power line presented an open and obvious danger to workers "who were not responsible"). We conclude Oncor has not made that showing—and we offer no opinion beyond that.

\* \* \*

The trial court did not err in denying Oncor's motion for summary judgment on its affirmative defense. *See Wolfenberger*, 73 S.W.3d at 448–49 (movant "did not prove conclusively as a matter of law that" injured party came within six feet of high voltage overhead line so as to have violated Chapter 752).

23

**CONCLUSION**

We affirm the trial court's order denying Oncor's summary-judgment motion, and we remand this cause for further proceedings consistent with our opinion.


Jennifer Caughey
Justice

Panel consists of Chief Justice Adams and Justices Rivas-Molloy and Caughey.